STATE of Minnesota, Respondent,

v.

Jerry A. WELLMAN, Appellant.

No. C4–82–1012.

Supreme Court of Minnesota.

Dec. 9, 1983.

C. Paul Jones, State Public Defender by Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Norman B. Coleman, Jr., James B. Early, Sp. Asst. Attys. Gen., St. Paul, Timothy Connell, Rock County Atty., Luverne, for respondent.

WAHL, Justice.

This is a child abuse case. Defendant was found guilty by a district court jury of three counts of assault in the third degree, Minn.Stat. § 609.223 (1982) (assault involving infliction of substantial bodily harm). The counts were based on separate assaults against the same victim on three separate occasions. The trial court sentenced defendant to consecutive terms of 1 year and 1 day for the first assault, 1 year and 1 day for the second, and 36 months for the third. Appealing from judgment of conviction, defendant argues for outright reversal of all three convictions on the ground that the evidence was insufficient. Alternatively, he seeks a new trial on the ground (a) that the trial court prejudicially erred in denying a defense mistrial motion when the prosecutor elicited rebuttal evidence indicating that twice previously defendant's ex-wife had charged him with assault and (b) that the unobjected-to admission of statistical evidence constitutes plain error of a prejudicial nature. Finally, defendant challenges the length of his sentence. We affirm.

The abused child is Jonathan, the son of the woman with whom defendant was living. The three convictions are based on incidents that occurred in February, April, and May of 1981, incidents that grew out of a pattern of abusive conduct by defendant directed toward Jonathan which began in the fall of 1979, when the child was 2½ years old.

On February 19 or 20, 1981, the mother came home and discovered that Jonathan had sustained a nose injury. She testified that defendant, who had been alone with Jonathan at the time, said that Jonathan had been taking a nap upstairs and had gotten up and was coming down when he fell down the steps. Jonathan had a rug burn on his face, his nose was swollen, and he was bruised in a number of places, including on his thigh. The mother testified that she questioned him and he said that he had fallen down the stairs but she testified that she did not believe him because defendant was there with him and Jonathan seemed scared. A doctor subsequently diagnosed the victim's injury as a fracture of the nose cartilage. Surgery was necessary to repair the damage.

On April 29, 1981, defendant became angry with Jonathan when he did not cooperate with defendant in a color-recognition test that defendant was administering. Defendant slapped the boy so hard that he fell down, then picked him up by the hair, then twisted his arm and pulled it behind his head until it made a popping sound. The mother took Jonathan to a doctor and told the doctor that he had been playing in the back of the pickup truck and had fallen out, which was defendant's explanation for what had happened. The doctor X-rayed the arm and found that the humerus was fractured in two places in the area of the elbow. He testified at trial that it was unlikely that a fall from a pickup truck would cause such an unusual fracture and that it more likely was caused by someone holding part of the arm still and twisting the other part. He also noted bruising about the face which was not recent in origin. An orthopedist operated on Jonathan's arm, putting some pins in it.

On May 19, 1981, the mother left Jonathan at home with the defendant and went to visit a friend. Defendant called her home, saying that Jonathan had fallen off the couch and hurt his leg. The mother took the victim to a doctor, who X-rayed the leg and found a spiral fracture of the tibia. He testified that a rotational motion or a twisting is necessary to cause such a fracture.

After child welfare authorities were contacted, a hearing was held to determine whether the mother should be permitted to retain custody of her children. She broke up with defendant shortly before the hearing, and he apparently was arrested following the hearing.

At trial, the witnesses who testified against the defendant were the mother, her oldest child (who corroborated some of the testimony about the abuse of Jonathan), and the doctors who treated Jonathan. A diagnostic radiologist with a pediatric subspeciality testified that in his opinion both the arm and leg fracture were unusual fractures caused by "severe twisting force" and not by falls. He testified, without objection, that there was less than a one percent chance that a fall of 2 feet from a couch would cause a leg fracture of that sort. He further testified that, considering both fractures, he was medically certain that they did not occur spontaneously or accidentally. He also testified that the two breaks were the types of breaks one frequently sees in child abuse cases.

Defendant testified that he had not abused the child and that all the injuries were the result of the accidents. His brother and two other relatives testified that they saw defendant with Jonathan on many occasions and that he never mistreated the child in their presence. One of these witnesses testified that she never saw defendant abuse any children. On cross-examination, the prosecutor asked her if she was "aware if he has ever had any convictions or abusive criminal charges." The trial court sustained a defense objection to this question.

After the defense rested, the prosecutor recalled the mother as a rebuttal witness. One of the sets of questions referred to a post-breakup meeting she had with defendant. Defendant testified that the meeting occurred on the date of the court hearing about custody of the children, that it was at her request and that she told him that

she wanted to have sexual intercourse. She testified in rebuttal that the meeting was at his request but that she wanted to talk with him also. Asked why she had wanted to talk with him, she said, "When I was talking to him I wanted to hear what he had to say. He told me that * * * I should watch what I say when I was in Court because he already had two charges of assault from his ex-wife." Defense counsel immediately objected and asked that the answer be stricken. The trial court sustained the objection, ordered the answer stricken and instructed the jury to disregard it.

A short time later, in a hearing outside the presence of the jury, defense counsel moved for a mistrial. The trial court stated that it did not think that the prosecutor intentionally elicited the evidence and, in any event, did not think it was prejudicial in light of the cautionary instruction. The court also gave a cautionary instruction as part of its final instructions to the jury. Earlier, when discussing the instructions with the court, defense counsel said that he felt that the instructions should be "sufficient" from defendant's point of view.

1. Defendant's first contention is that the evidence of his guilt was legally insufficient. He makes this contention primarily with respect to the conviction based on the broken nose, but in a footnote to his argument with respect to that issue he states that he is also challenging the sufficiency of the evidence with respect to the other convictions.

■ If the only injury in this case were the broken nose, the argument that the evidence was insufficient to establish that the injury resulted from an assault would be stronger. But in this case there were three injuries, and we believe that the jury was entitled to consider each injury in the context of the others. Doing that, we conclude that the evidence was sufficient that each of the injuries resulted from assaultive conduct by defendant, who was the child's caretaker on each occasion.

2. Defendant makes two arguments in support of his contention that he did not receive a fair trial and that a new trial on all charges is required.

(a) First, he argues that the prosecutor intentionally and improperly elicited the rebuttal testimony that at the meeting with the mother on the day of the custody hearing defendant told her to watch what she said because he already had two charges of assault from his ex-wife. (In fact, defendant did not have just two *charges* but two misdemeanor assault *convictions*, both in 1978, based on misconduct against his wife.)

It is not clear that the prosecutor intended to elicit this testimony. It is true that the prosecutor had tried once before to elicit evidence of defendant's misdemeanor record in cross-examining one of defendant's relatives. However, the question on rebuttal was "why" the mother wanted to talk with defendant, and the answer was nonresponsive to that question. Further, the trial court stated that it did not think that the elicitation of the testimony was intentional, and the prosecutor stated that it was not.

■ We need not decide the issue because we are satisfied that the evidence did not affect the verdict. The trial court ordered the evidence stricken and told the jury to disregard it. In its instructions it also reminded the jurors that they should not consider any evidence that was stricken. Finally, the evidence of defendant's guilt was very strong, making it less likely that the evidence in question affected the verdict.

■ (b) Defendant's other contention in support of his request for a new trial is that he was prejudiced by the admission of the opinion testimony that there was less than a one percent chance that a fall of 2 feet from a couch would cause the sort of leg fracture that Jonathan sustained. We do not consider this issue because defense counsel did not object to the evidence. Defendant therefore is deemed to have forfeited his right to have the issue considered on appeal.

3. The final issue is the sentencing issue. Assault in the third-degree is a severity level IV offense. The trial court computed the presumptive sentence for each offense using a zero criminal history score. This gave defendant presumptive sentences of 1 year and 1 day stayed for each of the offenses. The court then tripled the duration for the third offense, made all the sentences consecutive, and ordered execution of sentence, giving defendant a total guidelines term of 60 months in prison.

Recently, in *State v. Peterson*, 329 N.W.2d 58 (Minn.1983), we considered the issue of whether it is a departure with respect to consecutive service to sentence a defendant consecutively for multiple current convictions based on multiple crimes against a single victim at different times. We did not decide the issue because we found that there was no justification for any departure—either in terms of disposition, duration or consecutive service—but we made the following footnote comment:

Minnesota Sentencing Guidelines and Commentary, II.F. (1982) only makes three exceptions to the general presumption of concurrent sentencing. The closest exception in this case is II.F.2., which deals with current convictions for crimes against different persons. It is arguable that the Sentencing Guidelines Commission, in developing this exception, intended to differentiate single behavioral incidents with multiple convictions involving one victim from those involving multiple victims and did not contemplate multiple current convictions involving multiple crimes against a single victim at different times. On the other hand, it is arguable that the wording of the exception indicates that if two crimes are committed against a separate victim at different times, a consecutive sentence constitutes a departure. We do not decide the issue of the general applicability of this exception to multiple crimes against a single victim at different times. However, in the context of multiple acts of intrafamilial sexual abuse of a single family member at different times, the intent of the legislature is that the perpetrator be con-

victed and sentenced only once per victim, not once per act. *See* Minn.Stat. §§ 609.3641–609.3644 (1982).

329 N.W.2d at 60, n. 1.

The Sentencing Guidelines Commission, in its recent amendments, which become effective November 1, 1983, added a new comment clarifying II.F.2. in this respect. That comment reads:

The criterion that crimes must be against different persons for permissive consecutive sentencing is designed to exclude consecutive sentences in two types of situations. One type involves multiple offenses against a victim in a single behavioral incident such as burglary with a dangerous weapon and aggravated robbery with bodily harm. The requirement of different victims is also intended to exclude consecutive sentences in domestic abuse and child abuse situations when there are multiple incidents perpetrated against a victim over time. Assault, criminal sexual conduct, intrafamilial sexual abuse, and incest are the conviction offenses most frequently found in domestic abuse and child abuse cases. Multiple incidents against a victim typifies these types of situations. In fact, the intrafamilial sexual abuse provisions delineate multiple incidents as an element of the offense. The high severity rankings assigned to offenses that tend to involve very young victims reflect the understanding that multiple incidents generally occur in these kinds of situations. The Commission believes that a uniform policy reflected in high severity rankings provides the best approach in sentencing these cases. Permissive consecutive sentences would result in enormous disparity based on varying charging practices of prosecutors and discretionary judicial decisions.

There are rare instances in which multiple person crimes are committed at different times against a victim in other than a domestic abuse or child abuse situations [sic]. For example, a pharmacist could be a victim of an aggravated robbery at one point and sometime later

be robbed by the same offender a second time. Circumstances such as these are clearly atypical. In the rare instances in which this type of situation occurs, consecutive sentencing is permissive under the guidelines.

Comment, II.F.06.

■ We interpret II.F.2. in accordance with this clarifying addition to the comment. The result is that the use of consecutive sentencing by the trial court constitutes a departure with respect to consecutive service.

■ There are two ways to obtain the sentence of 60 months in this case. The trial court obtained the figure by using consecutive sentences and tripling the presumptive sentence duration for the third offense, or the court could have used consecutive sentencing and doubled the presumptive sentence duration for the second and third offenses. Either approach involves using aggravating circumstances to uphold both a durational departure and a departure with respect to consecutive service in the same case. The Guidelines do not explicitly state that the sentencing court cannot use one set of aggravating circumstances as justification for departing both durationally and with respect to consecutive service in the same case. However, a logical import of *State v. Evans*, 311 N.W.2d 481 (Minn.1981), is that generally the maximum sentence that a defendant should be given in a case in which departure is justified is two times the presumptive sentence duration and that it would be a violation of that principle to also use the aggravating circumstances in such a case to justify an additional departure, with respect to consecutive service, over and above the double departure as to duration.[1]

■ In *State v. Stumm*, 312 N.W.2d 248 (Minn.1981), also a child abuse case, we upheld a departure greater than double the presumptive sentence duration because of the presence of severe aggravating circumstances that justified making an exception to the *Evans* doubling rule. We now hold that the presence of severe aggravating circumstances on three separate occasions—the hitting and breaking of a small child's nose, the twisting and breaking of his arm, the twisting and breaking of his leg—justified the use of both a durational departure and a departure with respect to consecutive service in order to obtain a sentence of 60 months in prison.

Affirmed.

AMDAHL, Chief Justice (concurring specially).

The majority of the court has determined that a triple upward departure from the presumptive guidelines sentence for one of the three present convictions under the criteria of *State v. Stumm*, 312 N.W.2d 248 (Minn.1981), rather than the double upward departure of *State v. Evans*, 311 N.W.2d 481 (Minn.1981), is proper in this matter. I have no disagreement with that determination. I write only to emphasize that it is not only the individual, specific offenses, egregious as each is, which bring the sentence within the purview of *Stumm* rather than *Evans*. The tilting of the balance in favor of *Stumm* is brought about as a cumulative effect. The child, being too small to defend himself or to flee from the abuse, unquestionably suffered a continuing day-to-day reign of fear as well as periodic bone-fracturing physical abuse during the time the defendant lived with the victim and his family. A failure to recognize the situation of the child between episodes of actual physical abuse, as well as the effects of the actual physical abuse, would be a failure to recognize one of the principles of the Guidelines which is to make the sentence proportional to the crime.

---

**1.** The logic of the *Evans* case does not bar use of both a dispositional and a durational departure in the same case or a dispositional departure and one with respect to consecutive service in the same case.